UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


DULCE DELGADO, as Administrator of
THE ESTATE OF JASON C. GONCALVES,
and ROSA BERROA, as Mother and
Next Friend of JAYON JAVIER GONCALVES
and JASELYNE ROSE GONCALVES
                    Plaintiffs,

        v.                              C.A. No. 08-70ML

PAWTUCKET POLICE DEPARTMENT,
CITY OF PAWTUCKET, by and through
its Finance Director, RONALD
WUNSCHEL, RICHARD LAFOREST in
his official and individual capacity,
CHRISTOPHER R. LOMBARDI in his
official and individual capacity, and
GEORGE L. KELLEY III in his official
capacity,
                    Defendants.

<u>**MEMORANDUM AND ORDER**</u>

This litigation involves a high-speed automobile pursuit by
police that ended with the death of 21-year old Jason Goncalves
("Goncalves"). On August 12, 2005, Officer Christopher R. Lombardi
("Lombardi") and Officer Richard LaForest ("LaForest") of the
Pawtucket Police Department ("PPD") were patrolling a section of
Pawtucket. Lombardi was driving a marked police cruiser, LaForest
was riding along. After receiving a radio dispatch advising them
to be on the lookout ("BOLO")[1] for a suspect in a recent robbery in

---

[1]
    Officer Lombardi explained that a BOLO is differentiated from
an "attempt to locate," as the latter involves "actively looking

1

Providence, Lombardi and LaForest noticed a car which had some of the characteristics of the vehicle described in the BOLO in connection with the robbery.  The car was driven by 19 year old Josimar Pereira ("Pereira").  Goncalves was the only passenger.

Both young men had some familiarity with the PPD.  Pereira, noticing that the police cruiser was turning around and following him, attempted to evade the police cruiser and drove away at an accelerated speed, committing several traffic violations in the process.  After several minutes of pursuit by the police cruiser, Pereira ran a red light at high speed and his car was hit by another car driving through the intersection.  Pereira and Goncalves, both unrestrained, were thrown from the car.  Goncalves died from his injuries shortly after being admitted to the hospital.  Goncalves's estate brought claims against Lombardi, LaForest, the PPD, the City of Pawtucket (the "City") and, in his official capacity as Chief of the PPD, George L. Kelley III ("Chief Kelly"), for deprivation of Goncalves's constitutional due process rights and negligence.  The case is now before the Court on the defendants' motion for summary judgment.  For the reasons that follow, the defendants' motion is GRANTED, in part, and DENIED, in part.

---

for something," whereas the BOLO involves "to go about your ordinary patrol and just keep in your mind that there was an armed robbery in Providence if you see the vehicle described."  Lombardi Depo TR 33:1-11.

## I. Background Facts

### A.  LaForest's Account

On the Friday afternoon of August 12, 2005, Officers Lombardi and LaForest of the PPD Uniformed Patrol Division were assigned to bike patrol in the Main and Magill Street area in Pawtucket. According to Detective Captain Glenn Haberle of the PPD, Lombardi and LaForest were in a marked police cruiser because of the extreme heat on that day.  Plaintiffs' Ex. 21 1.   Lombardi drove the police cruiser with LaForest as a passenger.  While Lombardi and LaForest were patrolling the neighborhood, they received a BOLO via radio dispatch from the PPD to be on the lookout for a suspect in a recent robbery in Providence.  The BOLO described the suspect as a tall white male, wearing a white t-shirt, with sunglasses, shorts, dark hair, in his mid-thirties.  A car associated with the suspect was described as a  teal mid-size, four-door, "like a Buick," with a temporary plate in the rear window. Pltfs.' Ex. 22. It is undisputed that Pereira is African-American and Goncalves was Hispanic.

According to LaForest, the police cruiser was taking a right-hand turn onto Randall Street, as he observed the back end of a "bluish green-teal type" car going down Mary Street.  LaForest Dep. 58:16 - 59:19, March 5, 2009.  LaForest states that he and Lombardi saw the teal car for only a second but that they believed the car

was similar to the car described in the BOLO and decided to continue on Randall in the direction of Mary Street. Id. 60:3-17. LaForest explains that he did not notify dispatch after noticing the teal car because "until we know there's something, some kind of crime going on, we don't call dispatch." Id. 62:13-21. Once the police cruiser came up to Mary Street, Lombardi stopped and the officers noted that the teal car had a temporary license plate in the upper right hand side of the rear window. Id. 64:1-7, 65:11-19. Because "at this point, it was a little more looking like that might be the suspect vehicle," LaForest and Lombardi decided to check further and Lombardi started to back up the police cruiser. Id. 64:18-65:19. As the officers backed up to take a closer look, the teal car "sped up to the end of the street, took a right on Main Street without stopping at the stop sign, and just continued to go." Id. 79:9-14.

Lombardi turned onto Main Street in order to get a closer look at the teal car. Id. 78:7-10. According to LaForest, after they had driven about 100 feet on Main Street, he observed the teal car passing other vehicles by straddling the yellow lines separating the oncoming traffic lane. Id. 78:11-22. According to LaForest, at that point, the officers activated police lights and siren, notified PPD dispatch, and attempted to catch up to the teal car. Id. 78:23-79:3. LaForest explained that they could have activated the lights when the teal car failed to stop at the stop sign, but

4

that they waited until they observed the teal car passing other cars, after which they had it "totally in their minds that it had to be something to do with the robbery." Id. 79:24-80:6. At that time, LaForest called and notified dispatch that they "had a vehicle that took off on us, it was bluish-green-teal" and matched the vehicle described in the BOLO in connection with the robbery. Id. 86:19-87:19; 60:11-17. LaForest states that he spoke to Officer Robert Langlois and informed him of the police cruiser's location and the speed of their movement. Id. 87:17-19.

Once they turned onto Main Street, LaForest estimates that they were approximately 900 feet behind the teal car and that they maintained that distance for most or all of the time. Id. 84:14-22, 88:24-89:2. According to LaForest, he could not observe the subjects inside the teal car and could not identify how many people were in that car. Id. 89:3-8.

Lombardi and LaForest followed the teal car down Main Street, down Church Street and Park Place, where they lost sight of the car for a short time. Id. 83:1-21. The officers then spotted the teal car back on Main Street, "from hundreds of feet down flying on Main Street - driving on Main Street in the opposite direction of what we were going." Id. 85:7-12.[2] By LaForest's estimate, he and

_____

[2]

LaForest explained that, in that section of Pawtucket, all roads are one-ways and the submitted map reveals that, in order to get on Main Street in the opposite direction as before, they had to drive down Church Street and then onto Park Place. TR LaForest

Lombardi tried to catch up to the teal car for a little over two minutes. Id. 85:21-25. LaForest believes that the fastest speed of the patrol car during the pursuit was 40 mph, although he could not recall exactly. Id. 86:13-18.

LaForest states that he observed the teal car go through red lights and stop signs. According to LaForest, he made notations of that fact after he returned to the main station in order to issue traffic citations to the driver of the teal car. Id. 88:7-23. LaForest's narrative of the events is limited to a five-sentence paragraph, in which he simply describes that a car matching the description of a car used in a robbery passed his police cruiser; that he and Lombardi turned around to check out the car further; that the car sped off in an attempt to elude them; that they activated the lights and siren and "a short pursuit ensued;" and that the pursuit ended when the car was involved in an accident. Pltfs.' 9.

Once LaForest saw the occupants of the teal car, who had been thrown clear from the vehicle after the accident, he realized that they did not match the description of the robbery suspect given in the BOLO. Id. 112:3-13. According to LaForest, he first encountered Jason Goncalves and Josimar Pereira on that day, although he may have dealt with them in his role as a police officer on an earlier occasion. Id. 35:18-36:16.

_____

85:13-20. Pltfs.' Ex. 19.

6

B.  Lombardi's Account

Officer Lombardi acknowledged that he previously arrested Josimar Pereira in connection with a stolen car. Lombardi Dep. 27:4-21, June 17, 2009.  He also states that, three months before the accident, he had impounded a green Oldsmobile in connection with an incident involving George Goncalves, the decedent's brother.  Id. 20:4-21. He recounts that, within 30 minutes of receiving the BOLO that "a green vehicle bearing a Rhode Island temporary plate was involved in two armed robberies in Providence," id. 28:9-14, he and LaForest spotted the teal car.  Id.  Lombardi states that " a description of the occupants was given," in the BOLO, but that he could not remember it.   Id. 28:25-29:4. According to Lombardi, while he was driving on Randall Street, he saw a green car going down Mary Street with a temporary plate in the window.  Id. 38:2-11; 35:9-14.  He then stopped the cruiser on the intersection of Randall and Mary and attempted to make a three-point turn, id. 38:14-16, noting to LaForest that he thought this was the car from the robbery.  Id. 38:19-21.   According to Lombardi, he could not see the occupants of the car,  id. 38:2-6, and his intent was to "turn around, follow the vehicle, and stop the vehicle to see if the occupants matched the description of the armed robbery suspects." Id. 39:6-13.  Lombardi executed a three-point turn and proceeded down Mary Street.  As soon as the cruiser

7

had made the turn, the green car accelerated from its prior travel speed of 20/25 mph. Id. 39:20-40:3.   Lombardi states that he did not immediately activate his lights because he wanted to get a look at "the plate number to call everything out correctly." Id. 40:4-9.   Lombardi describes how the green car went through the stop sign at Mary and Main Street and took a right onto Main Street.   Id. 41:9-12.   Still, Lombardi did not activate his lights because he "wanted to see what the vehicle was doing, where it was going." Id. 41:41:14-19.   Once he turned the cruiser onto Main Street and Lombardi could see that the green car was in the southbound lane in order to pass cars, "we started calling it in and put our lights and siren on."   41:19-42:7; id. 59:14-20.   According to Lombardi, the green car was driving recklessly at that time, confirming the officers's belief that this was the suspect vehicle from the robberies. Id. 42:13.

Lombardi estimates that the entire pursuit of the car took approximately two to three minutes and states that they lost sight of the car several times.   Id. 60:16-25.   Lombardi acknowledges that the patrol car exceeded the 25 mph speed limit on Main Street, but maintains that he stopped at traffic signals and never got closer to the green car than 400 to 1200 feet.   Id. 61:4-62-24. The officers regained sight of the car as it passed other cars and went through red lights.   Id. 63:18-24.   During this pursuit, LaForest was calling in to dispatch to notify it of their location

8

and to call in the speeds of the pursuits. Id. 64:3-8. Based on his observation, Lombardi estimates the speed of the green car as reaching 50/60 mph and states that the cruiser was falling behind and did not catch up to the green car until it crashed. Id. 65:5-17.

Lombardi did not provide a same-day narrative on the events; he did, however, provide a witness statement on September 21, 2005. Pltfs.' 25. In that statement, Lombardi maintains that he turned the cruiser around to investigate a car matching the description of a car connected to two robberies in Providence. Lombardi also states that he activated lights and siren after observing the teal car "passing vehicles in the north bound lane by using the south bound lane of travel" on Main Street. Id.

C.  Josimar Pereira's Account

Pereira describes driving down Randall Street in a green Oldsmobile Cutlass with a temporary plate in the back window. Pereira Depo. 47:4-17, Oct. 1, 2009. According to Pereira, the car had been "kind of" given to him by a friend whose last name he could not remember. Id. 22:11-20. The car was not registered, but had a temporary tag in the rear window. Id. 20:21-21-5. Pereira recounts that, when he came to a stop, he looked over and saw Officer Medeiros.[3] Id. 47:9-12. According to Pereira, the cars

---

[3]

There is an inconsistency in Pereira's account regarding Officer Medeiros's involvement in this case that cannot be easily reconciled and for which no explanation has been provided.

passed each other and he could see in his rearview mirror that
Medeiros was turning the cruiser around. <u>Id.</u> 48:11-16.   Pereira
states that he was bothered by seeing the cruiser turn "because I
was pretty sure he was turning around because he realized who I
was.  He knew me," <u>id.</u> 49:6-10, and that he "had a feeling he was
going to come harass me."   <u>Id.</u> 49:13-14.   Pereira explained his

---

Pereira, in his deposition, recounts knowing several PPD officers
by name, particularly two that frequently stopped him, <u>id.</u> 12:9-11,
which included Officer Pendergast and Officer Medeiros, also
referred to as "Stretch."  <u>Id.</u> 12:3-19.  Pereira was also familiar
with Officer Lombardi, who knew Pereira and had pulled Pereira over
once before August 12, 2005; however, Pereira specifically denies
that Lombardi was one of the police officers who allegedly
"frequently would pull [him] over and harass [him]." <u>Id.</u> 13:11-13.
   Pereira then states that, on the day of the accident, he was
riding down Randall towards Main, and "I remember seeing Officer
Medeiros coming up Randall Street." <u>Id.</u> 17:23-25.  According to
Pereira, his car and the police cruiser were parallel to each
other, "driver to driver," and he confirms that Medeiros stared at
him.  <u>Id.</u> 18:20-19:1.  Upon questioning by plaintiffs' counsel,
Pereira testified at his deposition that he could not be sure how
many officers were in the cruiser, but that he "just really saw
Medeiros's face, because he realized it was somebody he knew. So we
kind of locked eyes, you know." <u>Id.</u> 30:5-12.  He later confirms
three times during his deposition testimony that he saw Officer
Medeiros, <u>id.</u> 47:9-12; 48:11-14; 49:6-10, explaining that "it
bothered me when he was turning around because he realized who I
was.  He knew me . . . I had a feeling he was going to come harass
me."
   It is undisputed that only Lombardi and LaForest were in the
police cruiser which pursued Pereira on the day of the accident.
On the day in question, Medeiros was working the front desk.
Medeiros Depo. 12:3-6, Oct.21, 2009.  After the accident, he was
assigned to go to the scene and accompany the victims to the
hospital.  <u>Id.</u> 12:6-12. Pereira, by his own account, was familiar
with both Lombardi and Medeiros prior to that date.  Throughout his
deposition testimony, Pereira specifically identifies Medeiros as
the officer which whom he locked eyes prior to the pursuit and he
explains the attempt to evade police with his anticipation that
Medeiros would "harass" him.  The driver of the patrol car on this
day, however, was Lombardi, who was also known to Pereira but who
had, according to Pereira, never harassed him before.

concern about being pulled over by conceding that the car he was driving "wasn't registered, the plate was just put on the car." Id. 49:24-50:5; 22:21-24.

According to Pereira, he "took off" once he noticed the cruiser turning around and getting behind him and that he "just wanted to get away from him." Id. 50:25-51:10. Pereira does not remember the cruiser lights going on at that time. Id. 21:6-10, 20-24. Pereira states that he was not speeding initially but that, after he turned onto Main Street and saw that the cruiser turned in after him, he accelerated. Id. 52:7-14. The traffic on Main Street, which has one lane in each direction, was busy at that time, and Pereira admits he passed a car in front of him by "going around" it. Id. 52:15-25; 53:1-6. Pereira also concedes that he was speeding at that time; that he was "trying to get away from the police;" and that his speed may have reached 60 mph. Id. 23:20-23, 24:12-17. He further acknowledges that there were traffic lights he went through and that he doesn't know "if [he] caught them green at the time or not." Id. 25:2-5.

According to Detective Charles Devine ("Devine"), who first interviewed Pereira at the hospital, Pereira stated to Devine that he was traveling at a speed of 50 to 60 mph as he went through the red light. Devine Depo. 36:14-25, March 9, 2009. The driver of

the other car involved in the accident, Robert Viruet,[4] estimated that Pereira was going at least 60 mph as he went through the red light.   Viruet also reported that police arrived almost immediately, although he did not see a police car behind the car that hit him.   Id. 37:22-38: 3.   Devine's narrative of the event states that he asked Pereira at the hospital why they ran and that Pereira responded: "I didn't want to go back to jail, I just got out."[5]   Pereira admitted to Devine that he had been driving and he stated that "I think my license is suspended." Pltfs.' 10 at 1.

After Pereira was released from the hospital, Devine spoke to him again after giving him a Miranda[6] warning.   At that time, Pereira stated that he was driving on Randall Street in a car belonging to George Goncalves, when a marked police cruiser passed him in the opposite direction, and that he saw the cruiser execute a U-turn and come up on him fast with the lights on.   Pereira then tried to get away from the police and the cruiser tried to stay with him with his lights and siren on.   The cruiser stayed with him for a few minutes until Pereira went through a red light and was

---

[4]

Viruet and his passenger, Jennifer Arsenault, agreed to return to make formal statements, but did not do so.

[5]

It was later confirmed that Pereira had been released from the Adult Correctional Institute on August 5, 2005.   Pltfs.' Ex. 21 at 3.

[6]

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)

hit by another car.  Id. at 1-2.

    D.  Radio Transmissions

    Detective Lieutenant Daniel Patrick Mullen ("Mullen") testified at his deposition that he was the officer in charge on the day of the accident and that he heard the initial transmission regarding the pursuit, followed shortly by a report of the accident.  Mullen Dep. 28:3-20, Aug. 11, 2009.  Mullen did not recall hearing any speed called out by LaForest or Lombardi during that time.  Id. 34:18-21.  Mullen's recollection was confirmed by the testimony of Officer Robert Henry Langlois, Jr. ("Langlois"), that Lombardi and LaForest reported spotting a possible match for the car associated with the robbery and then reported the accident shortly thereafter.  Langlois Dep. 34:1-11, Aug. 11, 2009. Langlois also states that he does not remember hearing call-outs of speed during the pursuit.  Id. 34:9-11.  When attempting to review the radio transmissions of the day of the accident, the PPD discovered that the dispatch lines had not been recorded since April 5, 2005 because a wire between the recorders and the transmitter was pulled out from the transmitter unit.  Allcock Dep. 19:12-24, 20:11-20, Oct. 21, 2009.

    II.  **Procedural History**

    In late 2007, the administrator of Goncalves's estate and the mother of his two minor children brought a complaint in Rhode Island state court against LaForest, Lombardi, the PPD, the City,

13

and Chief Kelley.   On February 29, 2008, the case was removed by
the defendants on the basis of federal question jurisdiction.   The
plaintiffs filed a first amended complaint on March 13, 2009.   The
amended complaint asserts claims of (Count I) deprivation of rights
pursuant to 42 U.S.C. § 1983 - Life and Liberty Interest; (Count
II) deprivation of rights pursuant to 42 U.S.C. § 1983 - Failure to
Train ; (Count III) Negligence; (Count IV) Reckless Disregard; and
(Count V) Loss of Parental Society and Companionship.

The plaintiffs allege that LaForest and Lombardi attempted to
stop Pereira's car without a sufficient basis to believe that
Pereira or Goncalves had committed a violation or offense; that the
officers then began a high-speed chase in violation of PPD policy
and without the existence of an emergency situation.   The complaint
describes LaForest's and Lombardi's actions as "conscience shocking
in that they acted with an improper and/or malicious motive in
initiating and continuing the High-Speed Chase" and "without any
reasonable justification."   Complaint ¶ 24. It further attributes
the officers' conduct to failure by the PPD and Chief Kelley to
train these officers regarding PPD policy on vehicular pursuits.
Id. ¶¶ 31-35.   The defendants deny plaintiffs' allegations and
assert several   affirmative defense, including absolute and
qualified immunity.

Following completion of discovery, the defendants filed a
motion for summary judgment. After receiving several extensions,

14

the plaintiffs filed a response in opposition to the defendants'
motion and the defendants filed a reply. The Court conducted a
hearing on the matter and took the defendants' motion under
advisement.

### III. Standard of Review

Summary judgment is appropriate only "if the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law." Fed.R.Civ.P.
56(c)(2). "A dispute is genuine if the evidence about the fact is
such that a reasonable jury could resolve the point in the favor of
the non-moving party." Thompson v. Coca-Cola Co., 522 F.3d 168,
175 (1st Cir. 2008). "[A] material fact is one that has the
potential of affecting the outcome of the case." Calero-Cerezo v.
U.S. Dept. of Justice, 355 F.3d 6, 19 (1st Cir. 2004)(citing
Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248-50, 106
S.Ct.2505, 91 L.Ed.2d 202 (1986)).

The burden to establish that no genuine issues of material
facts exist rests on the moving party. Once the party has met its
burden, the opposing party "may not rely merely on allegations or
denials in its own pleadings; rather, its response must - by
affidavits or as otherwise provided in this rule - set out specific
facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2);
Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008)("To defeat a

motion for summary judgment, evidence offered by the non-movant 'must be significantly probative of specific facts.'")(citations omitted).

The Court views "'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002)(citation omitted).   The Court does not "weigh the credibility of the testimony," but presumes "that a rational factfinder would accept it as stated by the witness." Gonzalez v. El Dia, Inc., 304 F.3d 63, 68 (1st cir. 2002).  However, "'[t]he mere existence of a scintilla of evidence' in favor of the nonmoving party is insufficient to defeat summary judgment." Barreto-Rosa v. Varona-Mendez  , 470 F.3d 42, 45 (1st Cir. 2006)(quoting Anderson v. Liberty Lobby).  Likewise, the Court will not accept "responses by nonmovants that adduce statements not based on personal knowledge or that adduce conjectural or conclusory allegations."  Bennett v. City of Holyoke, 230 F. Supp.2d 207, 214 (D.Mass 2002), aff'd, 362 F.3d 1 (1st Cir. 2004); Estate of Bennett v. Wainwright, 548 F.3d 155, 165 (1st Cir. 2008)(Court is "not required to contemplate conclusory allegations, improbable inferences, or unsupported speculation.").

"'Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations,

improbable inferences, and unsupported speculation.'" <u>Meuser v.</u>
<u>Federal Express Corp.</u>, 564 F.3d 507, 515 (1st Cir. 2009)(citations
omitted). "Furthermore, the non-moving party's burden cannot be
satisfied with a declaration that 'without proper explanation'
contradicts his/her prior deposition testimony." <u>Id.</u> (citing
<u>Torrech-Hernandez v. General Elec. Co.</u>, 519 F.3d 41, 47 (1st Cir.
2008)).

## IV.   The Section 1983 Claim

A plaintiff may bring a personal action under Section 1983 if
he has been deprived of a constitutional right by a person under
color of state law. <u>Evans v. Avery</u>, 100 F.3d 1033, 1036 (1st Cir.
1996). To support a substantive due process claim under 42 U.S.C.
§ 1983, the plaintiff must show (1) a "deprivation of a protected
interest in life, liberty, or property;" and (2) "that the
deprivation of this protected right was caused by governmental
conduct." <u>Rivera v. Rhode Island</u>, 402 F.3d 27, 33-34 (1st Cir.
2005). There is no question that the death of Goncalves
constitutes an invasion of a constitutionally protected interest
and it is undisputed that Officers Lombardi and LaForest acted
under color of law. The question is whether the officers' conduct
in pursuing the car, in which Goncalves was a passenger, violated
Goncalves's constitutional rights.

In the context of high-speed police pursuits, the United
States Supreme Court has established that only an executive action

that "'can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense,'" can be deemed a violation of substantive due process. County of Sacramento v. Lewis, 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)(citation omitted). Although Lewis acknowledges that "the measure of what is conscience shocking is no calibrated yard stick," id., it indicates that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. 523 U.S. at 849. Because "a purpose to cause harm" is required to establish due process liability in a pursuit case, "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability . . . under § 1983." Id. at 854.

Prior to the Supreme Court's decision in Lewis, the First Circuit explicitly refused to follow the Ninth Circuit Court of Appeals's earlier holding in Lewis that "deliberate indifference or reckless disregard" was "the minimum required to sustain a § 1983 claim in the context of a high-speed police pursuit." Evans v. Avery, 100 F.3d at 1037-38. Instead, the First Circuit held that "in order for a high-speed police pursuit to intrude upon substantive due process protections, the officers' conduct must not only manifest deliberate indifference to the plaintiff's rights, but must also shock the conscience." Id. Subsequently, the Supreme Court took certiorari in Lewis to resolve a conflict among the

circuits and the "shock the conscience" standard applicable to high-speed automobile chases aimed at apprehending a suspected offender was firmly established.

Plaintiffs suggest that the actions by the officers should be examined under the "deliberate indifference" standard, applicable to cases where "split-second judgments are unnecessary." Pltfs.'s Mem. 11. However, as noted supra, to withstand summary judgment on a substantive due process claim, the evidence, when viewed in a light most favorable to the plaintiffs, must demonstrate that the police officers' conduct was oppressive or conscience-shocking. County of Sacramento v. Lewis, 523 U.S. at 846-47, 118 S.Ct. 1708, 140 L.Ed.2d 1043.

By Pereira's own account, he sought to evade police because he believed himself to be in violation of the law and did not want to be arrested after just having been released from prison. Assuming, for the purpose of summary judgment, that Pereira believed he locked eyes with Lombardi (and overlooking the fact that Pereira repeatedly misidentified the driver of the police cruiser as Medeiros), Pereira merely asserts that he "had a feeling he was going to come harass me." Pereira also states that he was "pretty sure he was turning around because he realized who I was," which is just the type of "conjectural or conclusory allegation" insufficient to avoid summary judgment. Moreover, Pereira freely admitted that he deliberately tried to "get away" from police

because he was driving an unregistered car. In addition, plaintiffs' contention that this was "not a high-speed chase," but a case of "deliberate police oppression and calculated harassment, motivated by Goncalves's history," is entirely unsupported by the evidence. It is undisputed that Pereira, when he noticed the police cruiser turning around, began to leave the area at increasing speed, and that the cruiser followed in pursuit. There has been no indication that the officers even knew Goncalves was in the teal car.

In sum, even if the Court were to accept Pereira's testimony without weighing its credibility, as is required in the context of a summary judgment motion, Pereira's statements that he "was pretty sure" why the patrol car was turning around and that he "had a feeling" he was going to be harassed are lacking in any factual support. Assuming that Pereira "locked eyes" with the driver of the patrol car, and that Lombardi recognized him, Pereira's conclusion that he was about to be harassed was based on (1) prior experiences with an officer other than Lombardi, and (2) Pereira's concern that he was driving an unregistered (and, apparently, uninsured) car.

By contrast, nothing in the submitted evidence supports a contention that Lombardi or LaForest intended to harm Pereira or Goncalves physically or that the officers had any information that would enable them to worsen Pereira's or Goncalves's legal plight.

There also has been no allegation that the officers attempted to stop Pereira's car before Pereira began to drive away in order to evade them.  By all accounts, the pursuit of Pereira's car by the officers lasted no more than 2-3 minutes.  Pltfs.' Statement of Undisputed Facts ("PSUF") ¶ 50.  During that time, Pereira admittedly committed several traffic violations, including running red lights and stop signs, exceeding the speed limit, and passing cars in an oncoming traffic lane.  PSUF ¶ 52.  By his own action, Pereira created a hazardous condition in busy traffic that only ended with the accident during which Goncalves lost his life.  Even if Lombardi and LaForest were not certain that the green Oldsmobile with the temporary Rhode Island tag in the rear window corresponded to the BOLO description of a teal car with a temporary Rhode Island tag in the rear window, there is nothing to indicate that they did anything more than to turn around after seeing the green car.  It was Pereira who immediately started evasive maneuvers by accelerating his speed, running a stop sign, and passing cars by driving into the oncoming traffic lane.  On those undisputed facts, the decision of the officers to pursue Pereira's car and their conduct during the pursuit were not so objectionable as to satisfy the "shock the conscience" test established in <u>Lewis</u>.

## V. The Failure to Train Claim

The Plaintiffs have alleged that the PPD's and Chief Kelley's failure to train Lombardi and LaForest with respect to Pawtucket

Police Policy 430.05[7] resulted in the deprivation of Goncalves's constitutionally protected interests, <u>see</u> Amended Complaint ¶¶ 31-33, and they submit that a court may hold a municipality liable where a constitutional violation exists. Pltfs.' Mem. 17.

In order to raise a claim of liability against the PPD, the City, or Chief Kelley, the plaintiffs must show that (1) the alleged harm was caused by a constitutional violation; and (2) the PPD, the City, or Chief Kelley are responsible for that violation. <u>Young v. City of Providence ex rel. Napolitano,</u> 404 F.3d 4, 25-26 (1st Cir. 2005)(citing <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). A municipality's alleged "failure to train or supervise its police officers only becomes a basis for liability when 'action pursuant to official municipal policy of some nature caused a constitutional tort.'" <u>Kennedy v. Town of Billerica</u>, —F.3d.—, 2010 WL 2740000 *8 (1st Cir. July 13, 2010)(quoting <u>Monell v. Dept. of Soc. Serv. of City of New York</u>, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); <u>see</u> <u>Flowers v. Fiore</u>, 359 F.3d 24, 35 (1st Cir. 2004) (liability that municipality may have under § 1983 is "derivative from unconstitutional actions of the defendant police officers.")

In this case, this Court has determined Goncalves was not subjected to a due process violation. Because the plaintiffs'

---

[7]

Section 430.05 establishes guidelines for use during vehicular pursuits. Pltfs.' Ex. 14.

claims against the PPD, the City, or Chief Kelley depend on a finding of liability against Lombardi and LaForest on that ground, no liability can be imputed against the PPD, the City, or Chief Kelley. <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2 806 (1986)(per curiam)(finding no municipal liability if the plaintiff " suffered no constitutional injury at the hands of the individual officer"); <u>see</u> <u>Evans v.</u> <u>Avery</u>, 100 F.3d at 1039 (declining to adopt rule in Third Circuit that "in a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution").

## VI. Claims of Negligence and Reckless Disregard

In order to raise a claim of negligence against Lombardi and LaForest, the plaintiffs must establish a legally cognizable duty owed to them by these defendants, "a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." <u>Ouch v. Khea</u>, 963 A.2d 630, 632-33 (R.I. 2009). The complaint alleges that LaForest and Lombardi breached their duty of care; that they violated PPD Policy 430.05 ("Section 430.05"); and that, in the absence of an emergency, they negligently engaged in a high-speed chase. Amended Complaint ¶¶ 40-48. With respect to the claim of reckless disregard, plaintiffs claim that, pursuant to R.I.Gen. Laws § 31-12-9, LaForest and Lombardi "owed Plaintiffs a duty to drive with due regard for their

safety and the safety of all persons," and that they initiated a high-speed chase "without reasonable belief that Goncalves or . . . Pereira committed any violation or crime." Id. ¶¶ 51, 52. Defendants have denied the claims and maintain that they followed Section 430.05.

The plaintiffs submit that the limited statutory protection for drivers of emergency vehicles under R.I. Gen. Laws § 31-12-6 is not available to the defendants because (1) no emergency existed; (2) they were not in compliance with R.I. Gen. Laws § 31-12-8; and (3) they acted with reckless disregard. Pltfs.' Mem. 20-21, 25-27. In response, the defendants argue that they owed no duty of reasonable care to Goncalves, and that Pereira's flight, involving multiple, dangerous traffic violations, constituted a superseding cause of the accident. Defs.' Mem. 11-12.

R.I. Gen. Laws § 31-12-6 states as follows:

> The driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an alleged violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in § 31-12-7, but subject to the conditions stated in this section and in §§ 31-12-8 and 31-12-9. R.I.Gen. Laws § 31-12-6(a) (emphases added).

Section 31-12-7 permits the driver of an emergency vehicle, inter alia, to disregard red lights and stop signs, and to exceed the speed limit, R.I. Gen. Laws §§ 31-12-7 (2),(3), provided the

driver gives an audible warning signal, such as sounding a siren.[8]
R.I. Gen. Laws § 31-2-8.  In addition, the driver is required "to
drive with due regard for the safety of all persons,"[9] and is not
protected "from the consequences of the driver's reckless disregard
for the safety of others."  R.I. Gen. Laws § 31-12-9.

In other words, the driver of an authorized emergency vehicle,
if he is pursuing an alleged violator of the law and in compliance
with Section 31-12-7, is "subject to liability only for 'his
reckless disregard for the safety of others,' not for mere
negligence." Medeiros v. Town of South Kingstown, 821 F.Supp. 823,
828 n. 1 (D.R.I. 1993).  Reckless disregard "imparts a disregard by
the accused for the consequences of his act and an indifference to
the safety of life and limb." Roberts v. Kettelle, 356 A.2d 207,
213 (R.I. 1976).  The driver of an emergency vehicle is considered
"reckless," if he "operates his vehicle in such a manner as to
demonstrate a heedless indifference to the consequences of his
action" and he exhibits a "reckless disregard for the safety of

---

[8]

Authorized emergency vehicles other than those operated as
police vehicles are also required to be equipped with or display a
right light visible from in front of the vehicle.  R.I. Gen. Laws
§ 31-12-8.

[9]

As noted by the Rhode Island Supreme Court in Seide v. State
of Rhode Island, 875 A.2d 1259 (R.I. 2005), "[a]lthough the duty
extends to 'all persons,' the statute waives immunity only for the
'consequences of the driver's reckless disregard for the safety of
others' who are not involved in the pursuit." Seide, 875 A.2d at
1268 n.10 (Emphasis added).

others."  Id. at 213-14.

The plaintiffs' position that the protection of Section 31-12-6 applies only when an emergency exists is unsupported by the plain language of the statute or by case law.  Under the statute, the driver of an emergency vehicle "is entitled to certain privileges in an emergency or 'when in the pursuit of an alleged violator of the law.'" R.I. Gen. Laws § 31-12-6 (Emphasis added).  The analysis in Roberts v. Kettelle, 356 A.2d 207 (R.I. 1976), on which the plaintiffs rely, is not instructive in the circumstances of this case.  In Roberts, which was not a pursuit case, the driver of a police car had slowed below the required minimum speed so he could assume a post off the highway to be on the lookout for an escaped gunman.  The Roberts court's analysis focused on whether an emergency existed that would exempt the police officer from the minimum speed regulations.  The Court reasoned that "if no emergency is found to exist, the driver's conduct is to be scrutinized under standards applicable to all other drivers, that is, whether he was negligent." Roberts v. Kettelle, 356 A.2d at 213.  However, nothing in Roberts indicates that, in the case of "a pursuit of an alleged violator of the law," an emergency must exist at the same time in order to qualify the driver of an emergency vehicle to disregard certain traffic rules.

The interpretation that Section 31-12-6 provides protection for officers in pursuit, regardless of whether an emergency exists,

26

was confirmed by the Rhode Island Supreme Court in <u>Seide v. Rhode Island</u>, 875 A.2d 1259 (R.I. 2005), which declared that "[i]n this state, an officer engaged 'in the pursuit of an alleged violator of the law' is characterized as a driver of an 'emergency vehicle' and statutorily privileged to proceed through a red light or at a stop sign; to exceed the speed limit, 'so long as he or she does not endanger life or property.'" <u>Seide v. Rhode Island</u>, 875 A.2d at 1263.

By Pereira's own admission, he was exceeding the speed limit, running traffic lights and stop signs, and driving across yellow lines into the oncoming traffic lane in order to pass cars. Because the police officers were pursuing an individual who admittedly committed a number of traffic violations, there is no need to inquire whether the situation also constituted an emergency.

However, the discussion does not end there, since the protection of Section 31-12-6 is also subject to the conditions in Section 31-12-8.   R.I. Gen. Laws § 31-12-6(a).   Section 31-12-8 provides that "[t]he exemptions granted in this chapter to an authorized emergency vehicle <u>shall apply only</u> when the driver of the vehicle while in motion sounds an audible signal by bell, siren, or exhaust whistle as may be reasonably necessary . . ." R.I. Gen. Laws § 31-12-8. (Emphasis added).

Although Laforest and Lombardi maintain that the lights and

siren were activated, once they saw Pereira begin to cross the yellow lines in busy traffic, the issue is not without dispute. According to Devine, Pereira stated in his post-Miranda interview that the lights and siren were on when the cruiser pursued him. However, in his sworn deposition, Pereira insists that the lights and siren were never activated. Because, at summary judgment, the Court does not undertake a credibility determination, but must view the presented facts in the light most favorable to the non-moving party, the question of whether the "reckless disregard" standard is to be applied to the pursuit cannot be determined at this stage.

Assuming therefore, in the context of a motion for summary judgment, that the defendants are not entitled to the protection of Section 31-12-6 and owed the standard duty of care to the plaintiffs, the remaining question is whether Pereira's flight was a superseding cause that interrupted the cause of events leading to Goncalves's death or whether Pereira's conduct was reasonably foreseeable, such that the causal connection remained unbroken.

If an intervening cause is deemed to be not reasonably foreseeable, "the intervening or second act becomes the sole proximate cause of the plaintiff's injuries." Almeida v. Town of N. Providence, 468 A.2d 915, 917 (R.I. 1983). It is established law in the First Circuit that "issues of foreseeability are generally for the jury." Medeiros v. Town of South Kingstown, 821 F.Supp. at 828. The Rhode Island Supreme Court also has determined

that, "[g]enerally, whether an intervening cause was foreseeable is not the province of the trial justice but is a question of fact that should be submitted to the jury." Seide v. Rhode Island, 875 A.2d at 1270.

In Almeida, on which defendants rely, a high-speed chase ensued after a police officer stopped a motorist, believing that the motorist was in need of assistance. The motorist "hit the gas and took off," with the police car in pursuit, which ended in an accident and the death of the motorist's passenger. Almeida, 468 A.2d at 916. After a trial on the merits, the trial judge directed a verdict against the plaintiff for failure to prove causation. The Rhode Island Supreme Court upheld the trial court, holding that the defendant officer could not have reasonably foreseen the motorist's flight, "[g]iven the fact that [the motorist] had not violated any laws or ordinances while in [the officer's] presence." Almeida, 468 A.2d at 917.

Here, Pereira started to try and "get away" immediately after he allegedly "locked eyes" with the driver of the police cruiser and before the officers even had an opportunity to indicate their intent, whatever that may have been. Within moments, Pereira ran the first stop sign and began to pass cars at a high rate of speed by driving into the oncoming traffic lane. The evidence, even when viewed in the light most favorable to the plaintiffs, reveals that Pereira was determined to flee the scene because he anticipated

getting into trouble for an unregistered car, not because the police officers had already begun a pursuit or made any attempt to pull Pereira over.[10]  However, while the commencement of the pursuit may not have been foreseeable, it is conceivable that a jury may reasonably differ on whether the continuation of the pursuit after Pereira had started to run traffic signs and speed in busy traffic made an accident likely and, therefore, "foreseeable".  See Seide, 875 A.2d at 1268.  ("Simply put, the driver of an emergency vehicle and his or her state or municipal employer are liable for the foreseeable consequences of a high-speed pursuit initiated, conducted, or continued in reckless disregard for the safety of others.") (Emphasis added).

This is a close case.  The question of which level of care is to be applied to the conduct of the defendants depends on a factual determination of whether the officers qualify for the protection of Section 31-12-6, which, in turn, depends on a credibility determination regarding the officers' and Pereira's testimony. Likewise, the foreseeability of the consequences resulting from the pursuit is an issue to be decided by the jury.  For those reasons, the Court is of the opinion that the plaintiffs' negligence claim is not ripe for summary judgment at this time.

---

[10]

In their memorandum, the plaintiffs argue that "[h]ere, as in Seide, the car only began to drive dangerously when the Officers activated their lights."  Pltfs.' Mem. 23.  This argument appears to be inconsistent with Pereira's insistence at his deposition that the lights were never activated.

## VII. Qualified Immunity

Lombardi and LaForest assert that they are "entitled to qualified immunity from Plaintiff's state law claims as well as his federal claims." Defs.' Mem. at 25 n.3. No protracted discussion is required in this case. With respect to the plaintiffs' Section 1983 claim, the Court has determined that the undisputed facts fail to establish that the defendants acted with the "shock the conscience" standard necessary to raise a due process claim. With respect to the negligence claim, the question of qualified immunity in these circumstances has been decided by the Rhode Island Supreme Court in Seide. "Unquestionably, § 31-12-9 is an express waiver of an officer's immunity from suit because it provides that the driver of an emergency vehicle is not protected 'from the consequences of [his or her] reckless disregard for the safety of others.'" Seide, 875 A.2d at 1268. In other words, the assertion of the qualified immunity defense is unnecessary for the Section 1983 claim in this case and, should the plaintiffs establish liability against the defendants for negligence, immunity has been circumscribed by Section 31-12-9.

### Conclusion

For the reasons stated herein, the Defendants' Motion for Summary Judgment is GRANTED with respect to (1) the claims against Lombardi and LaForest under Section 1983; and (2) the claims against the City, the PPD, and Chief Kelley for failure to train.

31

The Defendants' Motion for Summary Judgment is DENIED with respect to the claims against Lombardi and LaForest for negligence and reckless disregard.

SO ORDERED.

Mary M. Lisi
Chief United States District Judge

September 30, 2010
~~October ____, 2010.~~